```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF RHODE ISLAND
```

_____
                                    )
NEW ENGLAND HEALTH CARE EMPLOYEES   )
UNION, DISTRICT 1199, SEIU,         )
                                    )
     Plaintiff and Counterclaim     )
     Defendant,                     )
                                    )
          v.                        )    C.A. No. 15-66 S
                                    )
WOMEN & INFANTS HOSPITAL,           )
                                    )
     Defendant and Counterclaim     )
     Plaintiff.                     )
_____)

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, Chief Judge.

Defendant and Counterclaim Plaintiff, Women & Infants Hospital ("Hospital"), filed a motion for a temporary restraining order. (ECF No. 11.) Plaintiff and Counterclaim Defendant, New England Health Care Employees Union, District 1199, SEIU ("District 1199" or "Union"), opposes the Hospital's request. (ECF No. 12.) This Court held a full-day evidentiary hearing on the Hospital's motion on March 23, 2015; for the reasons that follow, the Hospital's motion is DENIED.

I.  Background

The facts giving rise to the instant dispute can be quickly recounted. The Hospital and District 1199 are parties to four collective bargaining agreements ("CBAs") governing terms and

conditions of employment at the Hospital. On February 18, 2015, the Hospital, believing that the exception to the no-layoff provision of the CBAs had been triggered, notified District 1199 that it planned to lay off Union members.[1] In response, District 1199 launched a two-tiered defense: it first filed a grievance alleging that the planned layoffs violate the CBAs; and second, it also filed suit in this Court (Compl., ECF No. 1), seeking a so-called "reverse Boys Markets injunction," see Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 n.2 (1st Cir. 1988), in order to maintain the status quo pending arbitration (Pl.'s Mot. 1, ECF No. 2-1). This Court denied the Union's request on February 26, 2015, and the layoff process continued to run its course, with the parties agreeing to make efforts to streamline the arbitration.[2]

Undeterred, Patrick J. Quinn, District 1199's Executive Vice President, sent the Hospital a so-called 8(g) notice, see 29 U.S.C. § 158(g), on March 5, 2015, indicating that the Union intended "to conduct informational picketing and to engage in other concerted refusal to work consisting of refusal to accept overtime, committee assignments, or other work-related

---

[1] No nurses are slated to be laid off, although it appears that one nurse has recently accepted a voluntary severance package.

[2] The parties have informed the Court that the arbitration is scheduled for April 2, 2015.

activities not specifically required by the CBAs." (Hr'g Ex. D.)[3] In response, the Hospital filed a counterclaim against District 1199 (ECF No. 9), as well as a motion for a temporary restraining order (ECF No. 11); the Hospital also filed a grievance with the Union over the concerted activity (Hr'g Ex. E). The Hospital claims that it is entitled to injunctive relief under Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235 (1970), because the Union's concerted refusal to work, including refusal to accept overtime, constitutes a strike over an arbitrable grievance in violation of the no-strike provision of the CBAs. (Def.'s Mot. 2-3, ECF No. 11-1.) Additionally, the Hospital insists that, in the absence of injunctive relief, it will suffer irreparable harm because it will be forced to divert patients to other hospitals if nurses refuse to accept overtime. (Id. at 4.)

An evidentiary hearing on the Hospital's request for injunctive relief was held on March 23, 2015. At the hearing, the evidence revealed that nurses employed by the Hospital and represented by the Union each have a set number of "requisitioned" hours per week; a nurse may work in excess of his or her requisitioned hours by voluntarily accepting

---

[3] The notice conveyed that the concerted activity would commence at 12:01 a.m. on March 23, 2015. (Hr'g Ex. D.) During an in-chambers conference, District 1199 agreed to postpone this start date to March 30, 2015.

3

additional shifts or overtime.[4]  For the Neonatal Intensive Care Unit ("NICU") and the Labor, Delivery, and Recovery Department ("LDR") at the Hospital, the Hospital posts enough shifts to cover the average daily patient census, the average number of patients in a particular unit over a given period of time.  To ensure adequate staffing in response to fluctuating patient census and acuity[5] levels, as well as employee vacations, leaves of absence, and sick days, the Hospital relies on nurses voluntarily accepting overtime.  Approximately eight to ten percent of nurse shifts at the Hospital are filled through acceptance of voluntary overtime.  Under the CBAs and Rhode Island law, see R.I. Gen. Laws § 23-17.20-3, the Hospital may not require nurses to accept overtime, except in emergencies.  Additional evidence from the evidentiary hearing is discussed below.

II. Discussion

In this case, context is critical.  As a general rule, the Norris-LaGuardia Act of 1932 prohibits a federal court from granting injunctive relief in a labor dispute.  See 29 U.S.C. §

---

[4] Quinn testified that the refusal to accept overtime referenced in the Union's notice covered acceptance of both additional shifts (at straight time) and overtime.  For simplicity's sake, any shifts in excess of an employee's requisitioned hours will be referred to as "overtime."

[5] Acuity refers to the level of care required by patients in a particular unit.

104; Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322, 651 F.3d 176, 183 (1st Cir. 2011). In Boys Markets, the Supreme Court created a narrow exception to this rule "to 'enforce[] the obligation that the [recalcitrant party] freely undertook under a specifically enforceable agreement to submit disputes to arbitration.'" Indep. Oil, 864 F.2d at 929 (quoting Boys Markets, 398 U.S. at 252-53). In this Circuit, "there are three conditions for injunctive relief under Boys Markets: '(1) the collective bargaining agreement must contain mandatory arbitration procedures; (2) the strike to be enjoined must be over an arbitrable grievance; and (3) "ordinary principles of equity" must warrant the injunctive relief.'" Verizon New England, 651 F.3d at 184 (quoting Nat'l Elevator Indus., Inc. v. Int'l Union of Elevator Constructors, 776 F.2d 374, 376-77 (1st Cir. 1985)). In determining whether such relief is warranted, this Court must remain mindful that the Boys Markets exception "must be tightly confined. Injunctions of this sort are, quite appropriately, a rarity. Unless some plain necessity exists, the escape hatch remains shut." Indep. Oil, 864 F.2d at 929.

The first two requirements are met in this case. First, the parties do not dispute that the CBAs contain mandatory arbitration procedures. Second, this Court finds that the

concerted refusal to work[6] is over the Hospital's position that it is entitled to lay off Union members, which is an arbitrable issue. At the evidentiary hearing, District 1199 disputed, for the first time, that the concerted refusal to work in this case was over the planned layoffs. Relying on <u>Buffalo Forge Co. v. United Steelworkers of Am.</u>, 428 U.S. 397 (1976), and <u>Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n</u>, 457 U.S. 702 (1982), the Union strained to portray its decision to issue the notice as stemming from Quinn's long-held philosophical and moral opposition to layoffs in general. There was some testimony, in addition to Quinn's own, supporting this theory. Joseph Roda, the Associate Vice President of Human

---

[6] District 1199 contends that, because its members have a right to voluntarily refuse overtime (except in emergencies) under both Rhode Island law, <u>see</u> R.I. Gen. Laws § 23-17.20-3, and the CBAs, a refusal to work overtime cannot violate the no-strike provision or support the issuance of a <u>Boys Markets</u> injunction. (Pl.'s Opp'n 1-4, ECF No. 12.) This Court disagrees. The no-strike provision of the CBAs provides that "[n]o employee shall engage in any strike, sit-down, slow-down, cessation or stoppage or interruption of work, boycott, or other interference with the operations of the institution" (Hr'g Ex. A, Art. XXIII(1)), and the "concerted refusal to work" promised by the Union's notice (Hr'g Ex. D), qualifies as interference with the operations of the Hospital. <u>See also</u> <u>Elevator Mfrs.' Ass'n of N.Y., Inc. v. Local 1, Int'l Union of Elevator Constructors</u>, 689 F.2d 382, 386 (2d Cir. 1982) ("Ordinarily a concerted refusal to perform 'voluntary' overtime work amounts to a 'strike' within the meaning of the National Labor Relations Act, 29 U.S.C. § 142(2), which defines a 'strike' as including any 'concerted stoppage of work [or any] concerted slowdown or other concerted interruption of operations by employees.'"); <u>Kone, Inc. v. Local 4, Int'l Union of Elevator Constructors</u>, No. 06-10093-DPW, 2006 WL 2987042, at *8-9 (D. Mass. Sept. 27, 2006).

6

Resources for Care New England ("CNE"), testified that, for the four years that he has known Quinn, Quinn has repeatedly voiced his political, philosophical, and personal objection to the concept of layoffs at the Hospital.

However, the Court is ultimately unpersuaded that Quinn's philosophical and moral objection provided the impetus for District 1199's concerted refusal to work. District 1199, hotly contesting the Hospital's position that it was entitled to lay off Union members, sought injunctive relief in this Court to forestall the layoffs. When this effort was unsuccessful, the Union sent the notice to the Hospital within a week of this Court's denial of the Union's motion for a temporary restraining order. Moreover, Quinn acknowledged on cross-examination that the notice was based, at least in part, on the layoffs. This history speaks volumes, and it is disingenuous for the Union to suggest that Quinn's philosophical beliefs about layoffs are at the heart of the Union's planned concerted activity. Instead, the Court finds as a fact that the concerted refusal to work was spurred by an arbitrable grievance.

The third condition for the issuance of Boys Markets injunctive relief — that ordinary principles of equity warrant such relief — is more problematic for the Hospital.[7] Because

---

[7] In Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 254 (1970), the Court identified the relevant

this Court determines that the Hospital's showing of irreparable harm is insufficient, the equitable analysis can begin, and end, with that issue. See Verizon New England, 651 F.3d at 186.

The Hospital argues that, if nurses refuse to accept voluntary overtime assignments, it will need to divert patients to other hospitals. According to the Hospital, patient diversion causes three types of irreparable harm: harm to the Hospital's reputation; harm to the patients being diverted; and economic harm in the form of lost revenues from diverted patients. However, the Hospital's evidence — both as to each type of irreparable harm identified and as to the likelihood that patient diversion would be necessary — was insufficient.

The Hospital's evidence on each type of irreparable harm is weak. For starters, although the Hospital claimed during oral argument that it would suffer reputational harm if it needed to divert patients, there was virtually no evidence presented to support this assertion. This case therefore stands in stark contrast to the case relied on by the Hospital for its reputational-harm argument. See Kone, Inc. v. Local 4, Int'l Union of Elevator Constructors, No. 06-10093-DPW, 2006 WL

---

equitable principles: "whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." (quoting Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 228 (1962) (Brennan, J., dissenting)).

8

2987042, at *10 (D. Mass. Sept. 27, 2006) (finding irreparable harm in the form of damaged customer relationships and goodwill where employer "demonstrated that . . . customers were dissatisfied with the delay they experienced [as a result of union's concerted action], and one customer contacted [employer's] competitors in search of a replacement"). The Hospital argued that reputational harm can be presumed from common sense, but it provided no case law to support that argument. This Court is unwilling to infer reputational harm solely on the basis of appeals to common sense. Cf. St. Barnabas Hosp. v. 1199 Nat'l Health & Human Serv. Employees Union, No. 96-7834, 104 F.3d 350, 1996 WL 518504, at *3 (2d Cir. Sept. 13, 1996) (holding, in the course of affirming the denial of a Boys Markets injunction, that hospital failed to establish irreparable harm from union's concerted activity – informational picketing — where hospital claimed that "it is 'common sense' that some potential patients will not cross a picket line"; court determined that hospital's argument was "insufficient to lift [hospital's] alleged injury about the 'remote and speculative' level"). This reluctance is reinforced by the evidence in this case, which revealed that, from time to time, the Hospital has diverted patients in the past, including during labor disputes. Notably, there was no evidence that the

Hospital suffered any reputational harm as a result of these past diversions.

Additionally, the evidence on the harm suffered by patients in the event of diversion was speculative and contradictory. Angelleen Peters-Lewis, the Hospital's Senior Vice President for Patient Care and Chief Nurse, testified that the stress of the transport to another hospital may be too much for a baby to survive. Peters-Lewis also testified that diversion could lead to the undesirable outcome of splitting up a sick mother and a sick baby, thereby putting the family unit in crisis. However, Mary Beth Taub, nurse manager of the NICU, testified that the Hospital would not divert any patient where there would be risk to the patient. Thus, the evidentiary record in this case is nothing like that presented by the employer in <u>Mediplex of Mass., Inc. v. Shalala</u>, 39 F. Supp. 2d 88 (D. Mass. 1999), upon which the Hospital relies. <u>See</u> <u>id.</u> at 98-100 (finding, in a case that did not involve a labor dispute, irreparable harm would result from the termination of a nursing facility's status as a provider of medical services under Medicare and Medicaid because the nursing facility supported its request for injunction with "extensive evidence" that showed that termination of status would result in closure of the facility and the accompanying transfer of the residents to other facilities and that the transfers would result in "transfer

trauma" for many of the frail and elderly patients). Moreover, Peters-Louis conceded on cross-examination that not all of the patients in the NICU require Level III care and not all of the patients in the LDR require Level IV care, the highest levels of care that the NICU and LDR, respectively, are authorized to provide. In the event that a patient requiring less than the maximum level of authorized care is diverted from the NICU or LDR, the patient can be transferred locally to a hospital in this state, thereby minimizing the transport time. Finally, although the Hospital has needed to divert patients in the past, neither Peters-Louis nor any other witness gave any examples of past diversions that posed a health risk to the diverted patients.

The Hospital's evidence on the economic harm from patient diversion is no better. Robert Pacheco, the Hospital's Vice President of Finance, testified on the reimbursement structure for the NICU and LDR. Although Pacheco related that the level of uncompensated care in these departments was minimal because of the effectiveness of the Hospital's financial counselors, he did not quantify that amount. Similarly, Pacheco testified that the Hospital will lose revenue if the Hospital diverts patients from the NICU and LDR, but he did not provide any monetary figures for the average reimbursements that the Hospital receives for patients that it treats in the NICU and LDR;

11

consequently, this Court has no baseline by which to gauge the amount of lost revenue that the Hospital may incur when it diverts a patient. Moreover, because some of the local hospitals to which patients may be diverted are part of the CNE network of which the Hospital is a member, it is not even clear that patient diversion will result in net financial losses to the Hospital (or the parent, CNE) in all cases.

Compounding these gaps in the Hospital's proof, other evidence casts doubt upon the Hospital's claim that patient diversion will necessarily occur if nurses refuse to accept overtime. To be sure, Taub testified that she was certain that diversions would occur if nurses refused to accept voluntary overtime. But the evidence demonstrated that the Hospital has several staffing alternatives available before it must resort to patient diversion. The Hospital has an array of potential stop gaps at its immediate disposal. For example, one of the means that the Hospital uses to address staffing shortfalls is offering shifts to per diem employees. Although per diems are members of the Union, they must accept a certain percentage of offered shifts in order to maintain their seniority. Quinn testified that the Union's concerted activity does not encourage per diems to jeopardize their seniority by refusing shifts; per diems are only encouraged to refuse to accept overtime hours. Additionally, there is a "float pool" of nurses available to

address staffing shortfalls. A handful of the nurses in the float pool are sufficiently trained to work in the NICU.[8] Independent of the float pool, there is an additional nurse known as a "floater" who is capable of working in the NICU. Finally, the evidence showed that, although the Union is generally opposed to Taub and the six to eight assistant nurse managers in the NICU[9] performing the work of nurses in the Union, the managers could take on additional hours in an effort to make up some of the staffing shortfall. Roda testified that the Hospital used nurse managers and assistant managers to fill vacant shifts in the past.

In addition to these currently available alternatives to patient diversion, the Hospital has two additional staffing alternatives on the horizon in the event that the concerted refusal to accept overtime endures for a prolonged period. First, the Hospital has recently hired several nurses to work in the NICU. Within the last two months the Hospital has posted twelve NICU positions; eight nurses have already been hired, and the Hospital is diligently working to fill the remaining positions. To be sure, a new hire is not able to immediately

---

[8] Peters-Louis testified that two or three nurses in the float pool could work in the NICU. Taub testified that there were four nurses in the float pool who were capable of working in the NICU.

[9] Peters-Louis testified that the NICU had eight assistant nurse managers, while Taub testified that there were six.

join the ranks of NICU nurses. To qualify for work in the NICU, a new hire must complete a three to six month training program or orientation. Peters-Louis was unsure of the training time remaining for the eight new hires because she was uncertain of their hire dates. In any event, once these new nurses become NICU qualified, they will relieve some of the staffing pressure resulting from overtime refusal. Second, the evidence demonstrated that the Hospital has used temporary nurses from a staffing agency in the past. Although the evidence indicated that it typically takes six to nine months for a staffing agency to obtain temporary nurses, the Hospital has not made any effort to contact a staffing agency to determine the current lag time for securing temporary nurses. While the Union opposes the use of such temporary nurses, it remains as an alternative to the Hospital in the event that the concerted activity lasts for several months.

Moreover, in the event that, because of a large uptick in the patient census, a combination of the above-mentioned staffing alternatives is insufficient to care for the Hospital's patient population at any given time, the Hospital might have, depending on the particular circumstances, the statutory right to mandate employees to work overtime until the emergency subsides. See R.I. Gen. Laws § 23-17.20-2(7) (defining "[u]nforeseeable emergent circumstance" as "an unpredictable

14

occurrence relating to health care delivery that requires immediate action, and which shall include . . . an irregular increase in patient census, or an irregular increase in the number of employees not reporting for predetermined scheduled work shifts"); id. § 23-17.20-3(d) (permitting a hospital to require a nurse to accept overtime work "in the case of an unforeseeable emergent circumstance when: (1) the overtime is required only as a last resort and is not used to fill vacancies resulting from chronic short staffing; and (2) the employer has exhausted reasonable efforts to obtain staffing"). Quinn agreed that, if the Hospital was facing a staffing emergency in circumstances satisfying the statutory criteria, the Hospital would be permitted to mandate overtime. Indeed, the Hospital has recently mandated overtime for nurses, and the Union did not contest the Hospital's authority to do so in those circumstances. Quinn also related that he is not aware of any situation when a nurse refused to accept overtime mandated by the Hospital, and he testified that the Union's position with respect to mandated overtime is to "work now, grieve later."

While the evidence made clear that none of these alternatives were ideal, the Hospital has failed to show that a combination of these alternatives will not adequately assuage the shortfall from the refusal to accept voluntary overtime to the point of creating irreparable harm. It remains to be seen

whether the Hospital can effectively utilize these options to relieve any staffing concerns that arise from the concerted activity, but, at this stage, the presence of these alternatives renders the Hospital's claim that patient diversion will occur overly speculative.[10]

For all these reasons, although the Hospital has shown that the refusal to accept voluntary overtime will make scheduling in the NICU and LDR more challenging for the Hospital, this Court concludes that the Hospital has not supported its claims of irreparable harm with enough evidence. However, in the event that the Hospital reasonably believes that it has evidence of irreparable reputational harm flowing from patient diversions that have occurred or are likely to occur or reasonably believes that subsequent events lend more concrete support to the Hospital's position that irreparable harm will occur as a result of the Union's concerted activity, nothing in this Order precludes the Hospital from returning to this Court to seek injunctive relief.

---

[10] It is also significant that, although the Hospital has ten different departments that could conceivably be affected by the concerted refusal to accept overtime, the Hospital has offered evidence on the effect the concerted activity would have on only two departments: the NICU and LDR. There is no basis in the record to conclude that the effect on the other departments would be the same or similar to that felt in the NICU and LDR. In any event, for reasons already explained, the evidence is insufficient to establish irreparable harm in either of these two units.

III. Conclusion

For the reasons articulated above, this Court determines that the Hospital failed to present sufficient evidence of irreparable harm. Accordingly, its motion for a temporary restraining order is DENIED.[11]


IT IS SO ORDERED.

/s/ William E. Smith
William E. Smith
Chief Judge
Date: March 27, 2015

---

[11] The Hospital's motion appears to seek only a temporary restraining order. (Def.'s Mot., ECF No. 11-1.) However, the only count of the Hospital's counterclaim seeks both a temporary restraining order and a preliminary injunction. (Answer & Counterclaim 7-9, ECF No. 9.) Because a party's characterization of the injunctive relief sought is not determinative and because this Court has held an evidentiary hearing and thoroughly determined the facts and examined the law, this Court treats the Hospital's motion as one for a temporary restraining order and a preliminary injunction and denies both forms of injunctive relief. See Fideicomiso De La Tierra Del Caño Martín Peña v. Fortuño, 582 F.3d 131, 133-34 (1st Cir. 2009) (per curiam); Maine Cent. R.R. Co. v. Bhd. of Maint. of Way Employees, 652 F. Supp. 40, 41 n.1 (D. Me. 1986) (treating employer's motion for temporary restraining order filed against union as a motion for preliminary injunction where union received notice of employer's motion and a hearing was held).